IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Government,

      vs.

PAUL DAVID HITE,

       Defendant.

_____

CR No. 12-0065
Washington, DC
June 12, 2015
1:25 p.m.

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:
DAVID B. KENT, ESQUIRE
ANDREA L. HERTZFELD, ESQUIRE
U.S. Attorney's Office
555 Fourth Street, NW
Washington, DC  20001
(202) 252-7963

ALEXANDRA R. GELBER, ESQUIRE
U.S. Department of Justice
Criminal Division
1400 New York Avenue, NW
Washington, DC  20530
(202) 307-1316

For the Defendant:
BARRY M. POLLACK, ESQUIRE
ADDY R. SCHMITT, ESQUIRE
Miller & Chevalier, Chartered
655 Fifteenth Street, NW
Suite 900
Washington, DC  20005
(202) 626-5830

Court Reporter:                    Lisa M. Foradori, RPR, FCRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6706
                                   333 Constitution Avenue, NW
                                   Washington, DC  20001
                                   (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
1                      P R O C E E D I N G S
2              THE COURT:  Good afternoon, everyone.
3              Good afternoon, Dr. Hite.
4              THE DEFENDANT:  Good afternoon.
5              THE COURT:  Let's proceed.
6              COURTROOM DEPUTY:  Criminal Case 12-065, the United
7    States versus Dr. Paul David Hite.
8              Counsel, would you please identify yourself for the
9    record.
10             MR. KENT:  David Kent on behalf of the United
11   States.  Good afternoon.
12             THE COURT:  Good afternoon.
13             MS. HERTZFELD:  Good afternoon, Your Honor.  Andrea
14   Hertzfeld on behalf of the United States.
15             THE COURT:  All right.
16             MS. GELBER:  Good afternoon, Your Honor.  Alexandra
17   Gelber on behalf of the United States.
18             MR. POLLACK:  Good afternoon, Your Honor.  Barry
19   Pollack on behalf of the defendant.
20             MS. SCHMITT:  Good afternoon, Your Honor, Addy
21   Schmitt on behalf of Dr. Hite.
22             THE COURT:  All right, good afternoon.  I think
23   what I'd like to do is to have the testimony relating to -- up
24   front -- relating to the restitution issue.  I can take a
25   short break and just put notes together and then I can do it
```

1    seamlessly, the sentencing, all the way through, as opposed to

2    taking a break later when we get to the restitution issue,

3    which would be done normally at the end.

4            MR. POLLACK:  Your Honor, if I may.  I can update

5    the Court that we've actually narrowed the areas of

6    contentions.  That may facilitate things.  I previously

7    informed the Court that the defendant had reached an agreement

8    with the victim, the Angela series, for restitution in the

9    amount of $1,750.

10           Since we spoke earlier today, Your Honor, the

11   defense has reached an agreement, and I informed the

12   Government of this, with the victim Amy, who is the subject of

13   the Misty series.

14           THE COURT:  Okay, hang on one second, let me --

15           MR. POLLACK:  Yes.

16           THE COURT:  Let me find -- okay.  And what's the --

17           MR. POLLACK:  An agreement for 5,000 of

18   restitution.

19           THE COURT:  All right.

20           MR. POLLACK:  And also with Andy, who is the

21   subject of the Sponge B series.

22           THE COURT:  They've done it as -- never mind.

23   Okay.  So -- which is the Sponge B series?

24           MR. POLLACK:  Correct, Your Honor.  And for that

25   victim there's also an agreement for restitution in the amount

1    of $5,000.  So the only victims who have sought restitution

2    for which there has not been an agreement at this point are

3    John Doe 2 and John Doe 4, who are both part of the 8 Kids

4    series.

5            THE COURT:  Okay.  And I'll ask Dr. Hite if he

6    agrees to those.  We still need, I assume, however, the

7    factual predicate for the identification of the victims and

8    the number of images or with having reached the agreement,

9    that issue has been obviated as well?

10           MR. POLLACK:  From my perspective I think the issue

11   has been obviated because we're doing it by agreement, but

12   certainly if the Court wanted to hear a proffer, I know that

13   the Government can make one.  But from the defendant's

14   perspective it's not necessary, we've done it by agreement.

15           THE COURT:  Okay.  So let me -- if I could -- let

16   me just make a note here for a quick second to make sure I

17   don't have any problems.

18           (Pause.)

19           THE COURT:  Sorry I take so long, these are --

20   these decisions are not -- are fairly complex the way the

21   Supreme Court has set this out.

22           So we have Angela, Sponge B and Misty, and then --

23   with agreements.  And so it's John Doe 2 and 4 that are no

24   agreement.

25           MR. POLLACK:  That's correct.  The only victims

1   that are at issue are John Doe 2 and John Doe 4.

2            THE COURT:  Okay.  If I could, and one way of

3   obviating it, if I could ask Dr. Hite if you could come up for

4   a second.

5            THE DEFENDANT:  Certainly.

6            THE COURT:  If we can just swear him in.  I'm just

7   going to inquire to make sure you've agreed to this.

8            COURTROOM DEPUTY:  Would you raise your right hand,

9   please?

10            (Defendant sworn by Clerk).

11            THE COURT:  All right.  Dr. Hite, you're entitled

12   to have the Government carry the burden of not only, within

13   the 409 images that are at issue, is that they would put on a

14   factual predicate evidence as to, either through proffer or

15   otherwise, as to the identity of the particular victims as

16   well as how many images are depicted within the 409 images

17   that are at issue.

18            And my understanding is you've reached agreement.

19   And these are names that are used for these, and they're

20   obviously not their real name.  With Angela for 1,750; Sponge

21   B for 5,000; and Misty for 5,000.  In terms that that would be

22   your agreement to pay those as restitution amounts; is that

23   correct?

24            THE DEFENDANT:  That is correct.

25            THE COURT:  Okay.  And in doing so, are you then

1    agreeing that or consenting to the fact that the Government --

2    that the -- these three individuals' images were in the 409

3    with the number of images associated with them?

4              THE DEFENDANT:  Am I agreeing that the Government

5    has.

6              THE COURT:  Identified them?

7              THE DEFENDANT:  -- appropriately -- okay.

8              THE COURT:  Okay.

9              MR. POLLACK:  Why don't I see if I can help.

10             THE COURT:  Okay.

11             MR. POLLACK:  I'll have Dr. Hite confirm for the

12   record that he is in agreement that the Government is prepared

13   to make a proffer that there were images of each of those

14   victims amongst the 409 images that were on the hard drive

15   that at one point was connected to Dr. Hite's computer.  And

16   that that would form a sufficient factual basis for the Court

17   to enter restitution awards to each of these victims.

18             THE COURT:  All right.  Do you understand what he

19   just said?

20             THE DEFENDANT:  I do, and I concur.

21             THE COURT:  All right.  So for Angela, Sponge B and

22   Misty, with the amounts I've just put on the record, the

23   Government would have put a proffer on or testimony,

24   whichever, and that you're accepting that they have a

25   sufficient factual basis, which presumably is a preponderance

1  of the evidence, that it would -- this proffer or testimony

2  would provide the evidentiary basis for identifying the

3  victims and the number of images of those victims within the

4  409.

5              Are we all in agreement?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Okay.  So then I won't require the

8  Government to put on evidence relating to -- or their proffer

9  relating to the victim we've identified as Angela, Sponge B

10 and Misty.  Okay.  So that still leaves the two John Does.

11 Okay.  You can go ahead and sit down.

12             MR. POLLACK:  Thank you, Your Honor.

13             THE COURT:  All right.  I'll leave it to the

14 Government then to still come back in terms of the two that

15 are left.  Let me just mark this down.

16             (Pause.)

17             THE COURT:  Okay.

18             MR. KENT:  Your Honor, with respect to the two that

19 are left, specifically, John Doe 2 and John Doe 4, two of the

20 victims in the 8 Kids series.

21             THE COURT:  Wait.  Let me just get the series out

22 here for a moment because I want to talk --

23             Okay.  Go ahead.

24             MR. KENT:  The Government and the defendant -- or

25 the defendant has indicated that he will accept a proffer from

1   the Government with respect to the identification of those two

2   victims, John Doe 2 and John Doe 4, as well as a proffer as to

3   the number of images that were included within the 409 images

4   that were located on the external storage device that I think

5   connected to the defendant's computer.

6           THE COURT:  Okay.

7           MR. KENT:  Specifically, had computer forensic

8   examiner Christy Gardner testified --

9           THE COURT:  I'm sorry, Christy --

10          MR. KENT:  Christy Gardner, G-A-R-D-N-E-R.

11          THE COURT:  Okay.

12          MR. KENT:  -- testified during this hearing, she

13  would have testified that her forensic analysis of the

14  defendant's HP laptop computer, and specifically, this is

15  Model DV7-3065DX with Serial Number CNF93647RQ, determined

16  that between at least October 2009 and March 2011,

17  approximately 409 images of child pornography were located on

18  an external storage device that had been connected to that

19  computer.

20          She also would have testified that she submitted

21  these 409 image files of child pornography to the National

22  Center for Missing and Exploited Children.  The National

23  Center for Missing and Exploited Children provided information

24  to her that those 409 images included 16 images of the victims

25  in the 8 Kids series.  Two of these images were, in fact,

1  duplicates.

2          She further would have testified that she provided

3  these images from within the 8 Kids series to the law

4  enforcement agent who investigated the production of those

5  images.  And that that law enforcement agent determined that

6  11 of those images depicted John Doe 4 and that three of those

7  images depicted John Doe 2 and John Doe 4, who were depicted

8  together in the same images.

9          THE COURT:  Okay, hang on one second, let me --

10  okay.  Go ahead.

11          MR. KENT:  And it's the Government's understanding

12  that the defendant will accept this proffer as a basis for

13  this Court to consider additional issues as far as whether

14  this Court should award restitution to those two particular

15  victims.

16          THE COURT:  So as I understand it then, Ms. Gardner

17  had taken the 409 images from the external storage device,

18  sent them to the National Center for Missing and Exploited

19  Children.  They had reviewed the 409 and identified 16 images

20  of victims in what's called the 8 Kids series, two of which

21  you indicated were duplicates.  And that the 8 Kids series,

22  the images were then sent to the law enforcement agent who had

23  investigated that -- that child pornography associated with

24  that series; is that correct so far?

25          MR. KENT:  That's correct.

1            THE COURT:  And that with that the law enforcement
2   agency identified John Doe 4 in 11 of the images and three
3   images had John Doe 2 and 4.
4            MR. KENT:  That's correct, Your Honor.
5            THE COURT:  All right.
6            Any questions or anything you want to ask?
7            MR. POLLACK:  Just one slight clarification to the
8   Court's summary there.  As I understand it, it wasn't the
9   external hard drive itself that was submitted to NCMEC.  The
10  Government does not have the external hard drive, rather,
11  there were 409 images in the computer thumb-cache.  Ms.
12  Gardner determined that those images had at a prior point in
13  time resided on the external hard drive, but it's the images
14  from the thumb-cache that would have been sent to NCMEC, not
15  the external hard drive itself.
16           THE COURT:  Is that correct?
17           MR. KENT:  That's correct, Your Honor.
18           THE COURT:  All right.  Then I'll find, based on
19  the proffer, since all the other victims have been -- the
20  amounts of restitution have been agreed to and they've been
21  identified as -- they've conceded the identification of the
22  number of images that it's only John 2 and 4 in the 8 Kids
23  series.
24           That based on the proffer beyond a reasonable
25  doubt -- not beyond a reasonable doubt, excuse me, --

1   preponderance of the evidence -- that Ms. Gardner, should she

2   have testified, that she would have indicated that she had

3   taken from the computer thumb-cache associated with Dr. Hite's

4   computer, the 409 child pornography images that have been

5   agreed to in this case, and that those images were sent to the

6   National Center for Missing and Exploited Children.  Those

7   were reviewed to see if they could identify known children.

8           The 16 images were identified, although two were

9   evidently duplicates.  So 14, actually in total, were

10  identified, associated with the 8 Kids series.  Once that

11  identification was done, then it was sent to the law

12  enforcement agency who had actually investigated the

13  production of that 8 Kids series.  And that agent identified

14  11 images that included John Doe 4, and three images that

15  included John Doe 2 and 4.  Is that correct?

16          And the law enforcement agency, do we have a name?

17          MR. KENT:  It's Immigration and Customs Enforcement

18  within -- it's a Homeland Security Investigations officer

19  within the Immigration and Customs Enforcement Agency.

20          THE COURT:  Okay.  So you don't want to put the

21  name on?

22          MR. KENT:  I'll put his name on.  His name is

23  Brian, B-R-I-A-N.  His last name is Bujdoso, it's

24  B-U-J-D-O-S-O, and he's a Special Agent within Homeland

25  Security Investigations in the Immigrations and Custom

13

1   Enforcement Agency.

2          THE COURT:  All right.  I think then I don't need a

3   break at this point in terms of proceeding with the

4   sentencing.

5          All right.  We're here for a sentencing of Dr.

6   Hite.  Dr. Hite entered a plea to Count 1, which was a federal

7   offense, possession of child pornography.  The statutory

8   penalties are a maximum of ten years in jail, a maximum fine

9   of $250,000.

10          Count 2, which is a District of Columbia offense,

11   arranging for a sexual contact with a real or, in this

12   particular case, a fictitious child.  The maximum penalty is

13   five years in jail.  The maximum fine 12,500.

14          The Presentence Report was revised as of

15   May 6th, 2015.  The Government also filed a notice concerning

16   the Rule 11(c)(1)(C) plea.  I haven't delineated all of them,

17   but there are various filings that -- in addition relating to

18   the restitution, and we did have a conference call earlier

19   today.

20          The Rule 11(c)(1)(C) plea, the total sentence that

21   was agreed to would be 84 months:  60 months on Count 1

22   consecutive to 24 months on Count 2.  And this would be the

23   sentence in terms of incarceration.  There would be, in

24   addition, concurrent ten year terms of supervised release on

25   both of the counts.  The total fine would be $262,000.  Count

1    1, it would be a $250,000 fine, which is the maximum statutory

2    fine, and Count 2 would be 12,500, which is the maximum D.C.

3    offense statutory fine.

4             In terms of objections, there was an objection --

5    and let me just go through these briefly.  There was -- the

6    defense had requested in Paragraph 9 that they indicate the

7    times that the defendant would have been in custody as well as

8    the times that he was on release.

9             Actually, Paragraph 9 just talks about his

10   adjustment in the Bureau of Prisons.  And it is their practice

11   in the front, which they have done on the face sheet in the

12   release status, to indicate the periods of time so it's right

13   under the offense.  The periods of time when he was arrested,

14   when he was held, when he was released, when he would have

15   been rearrested and whatever terms there have been.

16            And I think, looking back, it appears to be

17   accurate, and he was remanded to custody following the jury

18   verdict and has been held since then.  So I think that

19   resolves that issue.

20            Paragraph 65, defense counsel noted that the

21   parents' age has changed.  His father is now 87, his mother is

22   84, and his brother is 48.  I've gone ahead and made the

23   changes in the Presentence Report.  As a practical matter, we

24   ask them when they revise it to really only revise the

25   financial condition since from the date of sentencing to the

1   present he has not been out in the community.  But I have made

2   that correction and Probation will go ahead and correct those

3   ages.

4           Paragraph 71 was the other objection.  There is a

5   statement from his mother that was in the original Presentence

6   Report, and I would leave it there as a practical matter.  We

7   only updated -- and I don't believe that there's been a

8   dispute that that was the statement that she made.  So it's

9   just been simply left there since we did a -- in order to

10  expedite it -- a much more limited revision.

11          So I'll adopt the Presentence Report with the

12  correction to the parents' ages.  The Presentence Report parts

13  that are undisputed, I find findings of fact under

14  32(i)(3)(A).  The other minor disputed and/or the corrected

15  age would be under 32(i)(3)(B).

16          The advisory sentencing guidelines on Count 1,

17  which are the federal offenses, the possession of child

18  pornography, the base offense is 18, prepubescent minors were

19  involved so there's an additional two points.  Sadistic

20  material, an additional four points.  Use of the computer, an

21  additional two points.  At least 300 images but less than 600,

22  which will be an additional four points, which would give a

23  total of 30, minus 3 for accepting responsibility.  The total

24  offense level of 27, which I understand has been undisputed,

25  including the enhancements.  Is that correct?

1          MR. POLLACK:  That is correct, Your Honor.

2          THE COURT:  The criminal history, he has four

3    traffic violations but no points, so he is in Criminal History

4    Category I.  The advisory sentencing guidelines on Count 1,

5    which would be the federal, is custody 70 months to 87 months.

6    The supervised release on Count 1 is five years to life.

7    Probation, he'd ineligible for.  The fine is 12,500 to

8    125,000.

9          The D.C. voluntary guidelines, which relate to

10   Count 2, arranging for a sexual contact with a fictitious

11   child, the criminal history score is A.  And under their

12   voluntary guidelines, Count 2, custody would be 6 to 24

13   months.  Any kind of release into the community afterwards

14   would be a maximum of ten years, and the fine would be maximum

15   12,500.  There's also a special assessment, on Count 1 it's

16   $100, on Count 2 it's 100 to $5,000.  I will make it a special

17   assessment of $200 all together.

18          The Rule 11(c)(1)(C), the fines that have been

19   agreed to are the maximum.  The D.C. offense is 24 months,

20   which is within the D.C. voluntary advisory guidelines.  The

21   federal offense of 60 months is 10 months less than the

22   advisory guidelines, which is a range of 70 months to 87.  The

23   Government filed a justification, which the Court accepts and

24   accepting the Rule 11(c)(1)(C).

25          The Government indicated the combined sentence of

1    both of them are within the advisory sentencing guideline

2    range, which would include the 60 months plus the 24, which

3    comes to the sentence of 84 months, total sentence of 84

4    months.  And it's an appropriate balance in terms of accepting

5    responsibility for his role.  Taking into account the factors

6    under 3553(a) and other sections are met, and it obviates the

7    necessity of a retrial, and the Court views it as an

8    appropriate variance of the advisory sentencing guidelines.

9          So I don't know whether there's something that the

10   Government wishes to provide in allocution, defense counsel

11   and the defendant, if anyone wishes to address the Court.

12         MR. KENT:  Your Honor, not with respect to the --

13   certainly the issue on sentencing, only on the issue as to

14   restitution.

15         THE COURT:  Okay.

16         MR. KENT:  With respect to the issue of

17   restitution, the Government is requesting that the Court order

18   restitution to John Doe 4 as well as John Doe 2.  The

19   Government has presented the Court with not only their

20   restitution request, which is in a summary amount of $25,000,

21   but in those restitution materials, both John Doe 4 and John

22   Doe 2 have provided estimates concerning lost potential

23   earnings, also estimates concerning future medical and

24   emotional rehabilitation, treatment and counseling costs.

25         The restitution has certainly been awarded to the

1    victims in that series in amounts certainly ranging from 50 to

2    $37,500.  And I do think, certainly, based on the harm that

3    the restitution materials document and the continued harm to

4    these two victims based on the trafficking of images, which

5    has lead to the fact that the images of these victims being

6    sexually violated, the fact that they're viewed by other

7    individuals, the Government is requesting that this Court

8    award restitution to those two particular victims.

9         There have been approximately, as far as the

10   Government's calculations have been able to determine, 132

11   other cases as of May 7th of this year in which restitution

12   has been awarded to victims in that particular series.  And,

13   certainly, this Court can make an assessment as far as what

14   the defendant's role should be in contributing to the

15   continued harm to these two particular victims as well as his

16   role in light of other individuals who have been held

17   accountable by being required to provide restitution to these

18   two particular victims.

19        Certainly, the Supreme Court's decision in *Paroline*

20   provides some guidance, but it certainly allows this Court to

21   use its discretion in determining what those amounts should

22   be, and it also recognizes that there are twin goals

23   associated with restitution in these special types of cases

24   and this special context.  Certainly is a difficult decision,

25   but not one that is impossible.

1           And for those reasons the Government is requesting

2    that this Court award restitution to John Doe 4 and John Doe

3    2, two of the victims in the 8 Kids series.

4           THE COURT:  All right.  Anything -- Ms. Schmitt?

5           MS. SCHMITT:  Thank you, Your Honor.

6           Your Honor, as an initial matter before I address

7    the restitution with respect to John Doe 2 and 4.  Dr. Hite

8    would move to strike the final -- the fourth submission -- the

9    recent submission that the Government made under seal.  This

10   is a series of letters that I believe the Court addressed

11   briefly on the telephone conference earlier today.

12          And I apologize, Your Honor, but I don't know about

13   other counsel, we were having trouble hearing the Court, so I

14   think you did reference these letters that came in two days

15   ago.  But I don't know what --

16          THE COURT:  But I think you're talking -- as I

17   understand it, they provided additional information as to the

18   victims that were at issue, and they provided information that

19   related to victims that were not at issue, and I asked for a

20   clarification because when I first got it I wasn't quite sure.

21   Obviously, they always redact the actual real names.  So I

22   guessed at who everybody was.  I wasn't sure.  I indicated

23   that I would not be using them to make determinations as to

24   the restitution of the particular victims that are in this

25   case.

1              Did you file a motion to strike?  I don't remember

2    seeing it.

3              MS. SCHMITT:  We did not file a motion to strike,

4    Your Honor, but we would ask to strike those letters for all

5    purposes on the basis -- not just -- they're obviously not

6    seeking restitution.  But, in addition, several of the

7    letters, Your Honor, are irrelevant to these purposes because

8    they are very clearly written to the sentencing court with

9    respect to the initial abuser, and have no relevance to this

10   matter at all.  They don't speak to distribution or possession

11   or any harm caused by the viewing of the images.  They speak

12   very specifically to -- with respect to the -- their abuser.

13             So we would argue -- we would respectfully submit

14   to the Court that those have no bearing in this matter and

15   they're simply prejudicial and irrelevant.

16             Moreover, some of the letters do speak to harm,

17   some harm done by being viewed.  However, those letter are

18   either undated or several of them -- the ones that do have

19   dates, several pre -- at least one predates the time that

20   Dr. Hite --

21             THE COURT:  So are you talking about striking all

22   of it or just striking some of it?

23             MS. SCHMITT:  We would move to strike all of the

24   letters that were submitted with that final submission under

25   seal, Your Honor.  And this is the submission --

1          THE COURT:  Okay.  What's the Government's

2   position?  I mean, I was not going to consider the ones that

3   were not related to the victims, as not seeing them

4   particularly associated with the restitution issue, which is

5   what I have and what we were filing -- making pleadings with.

6   I certainly have looked at a number of images at the time of

7   the trial.  I don't -- so, I mean, that's a broader issue.

8   But I don't know what the position is.  Do you have a position

9   on this?

10         MR. KENT:  Yes, Your Honor.

11         THE COURT:  Okay.

12         MR. KENT:  When the defendant was first sentenced

13  in this case following the first trial, the Government

14  submitted -- at that time had similarly identified some of the

15  victims who were depicted in the images that the defendant

16  possessed.

17         The defendant filed a motion to strike the similar

18  victim impact statements that were submitted to this Court.

19  The Government responded to that argument, and it now appears

20  that the defendant is renewing that argument.  Certainly in

21  the context of sentencing in applying to 3553 factors, the

22  courts have found basically that the Court has wide discretion

23  to consider any materials that it seems -- it feels would be

24  relevant in the context of sentencing.

25         So there's not -- there's not a basis for this

1   Court to strike Victim Impact Statements, especially where, as

2   here, those Victim Impact Statements relate to child

3   pornography victims who were among the ones located and

4   determined to be located on the defendant's computer.

5         So certainly in the Government's view, there is not

6   a basis for this Court to strike those Victim Impact

7   Statements.  Even though, certainly, this Court is considering

8   restitution, that doesn't change the fact that there are

9   victims in this case of the defendant's conduct who are not

10  seeking restitution, that doesn't -- that is not a

11  justification for this Court to completely ignore the

12  statements provided on behalf of those victims who, like all

13  other victims of this conduct, will continue to be harmed by

14  it.

15        THE COURT:  I think it would have been helpful when

16  you filed this, however, to have made that clear.  In my

17  review of it, I assumed that they were being submitted in the

18  context strictly of the restitution issue.  So, in the

19  restitution issue it seemed to me I didn't need to look at,

20  you know, other victim statements that when they were not

21  asking for restitution.  There's obviously a broader base that

22  you can look at in the context, and I agree.  I don't

23  remember.  We've gone back and I've written orders, and I

24  don't remember when you clarified who they were that it was as

25  clear-cut as it could be as to how you wanted these different

1  letters that were submitted.

2         My suggestion is instead of my doing this

3  off-the-cuff, I think you should file something, and you can

4  respond it to, and I'll make a ruling.

5         MR. KENT:  Very well, Your Honor.

6         THE COURT:  Okay?

7         All right.  Ms. Schmitt?

8         MS. SCHMITT:  Thank you, Your Honor.  With respect

9  to the restitution, the appropriate restitution for John Doe 2

10 and John Doe 4, obviously, Dr. Hite has, as he said in his

11 pleadings, has agreed that an appropriate amount of

12 restitution should be ordered by the Court consistent with the

13 *Paroline* factors.  And we submitted an amount that is, in

14 fact, generous and on the high end of many -- relative to many

15 of the cases where restitution to those particular victims

16 have been -- has been ordered.

17        The Government in its initial pleading, as

18 obviously the Court is aware, made no submission with respect

19 to what amount would be appropriate, nor did it set forth

20 any -- nor did it come back and take any issue with the amount

21 suggested by Dr. Hite.  Nor did it distinguish any of the

22 cases cited by Dr. Hite in his pleadings with respect to cases

23 that have awarded lower amounts or higher amounts.

24        So we would respectfully submit that restitution in

25 the amount of $2,500 per John Doe -- for John Doe 2 and John

1   Doe 4 would be appropriate.

2           THE COURT:  All right.  Anything else?

3           MS. SCHMITT:  Unless the Court has --

4           THE COURT:  No, no, no, no.  I just didn't want to

5   cut you short if there was something else you wanted to bring

6   to my attention.

7           MS. SCHMITT:  No, Your Honor.

8           THE COURT:  That's fine.

9           Okay, Dr. Hite, I don't know whether you want to

10  address the Court or not, you have a right to, you're not

11  required to.

12          THE DEFENDANT:  Your Honor, I have nothing to say

13  at this time.  Thank you.

14          THE COURT:  All right.  Then in addition to the

15  advisory sentencing guidelines, the Court considers the

16  pleadings, arguments and record in this case, and including

17  the -- everything that the Court has -- has been presented to

18  the Court in terms of including the proffers that have been

19  made, in addition to the following information in determining

20  a fair, appropriate, and reasonable sentence in conformance

21  with the factors set out in 18 U.S.C. 3553(a), except (e).

22          The defendant is 60 years old.  In terms of

23  criminal history, he's got a series of driving offenses.  He

24  was fined in Virginia, found guilty of improper control,

25  driving on a reckless driving charge in 2006, which is the

1  most serious, and the rest are smaller infractions.

2           In terms of education, college, the University of

3  Virginia, he graduated in 1977.  He graduated from the Medical

4  College of Virginia in Richmond in 1981.  Completed his

5  residency in anesthesia in 1984.  Had been licensed in

6  Virginia and was Board certified in anesthesiology.

7           In terms of job history, from '85 to 2012, he was

8  employed as an anesthesiologist for the Commonwealth

9  Association in Richmond, Virginia.  From '84 to '85, he worked

10  for a national company as a physician in the District of

11  Columbia, Oklahoma and Virginia Beach.

12           In terms of financial condition, between IRA

13  accounts, other investments, personal banks, brokerage

14  accounts, five real properties, 11 cars, two motorcycles,

15  there's watercraft as well.  It would appear that all 11 cars

16  are now been paid off and all the real estate properties are

17  lien free.  That the total would be $6,394,453.  The only --

18  in terms of -- he owes his parents evidently $60,000.  Other

19  than that, everything else is lien free.

20           In terms of physical condition, he is on some

21  medications.  Mental health, emotional health, history of

22  anxiety and depression.  In 2000 he started seeing a

23  psychologist for, quote, relationship issues and Internet

24  addiction.  He was evaluated by Dr. Berlin, who did not

25  diagnose him as a pedophile.  Substance abuse, no issues.

1         On a personal basis, Dr. Hite was born in Virginia

2   to an intact familiar.  His father is a retired construction

3   contractor and his mother was a registered nurse.  He has one

4   brother who represents a pharmaceutical company.  No issues in

5   the home growing up.  His parents and brother and family have

6   been very supportive.  The defendant is single and has

7   fathered no children.

8         In terms of the offense conduct, and we're talking

9   about arranging for sexual conduct with fictitious child,

10  which I'll do first, as well as the possession of child

11  pornography, the Metropolitan Police Department through

12  Detective Timothy Palchak was acting in an undercover capacity

13  in terms of a multi-jurisdictional child exploitation task

14  force.  And Detective Palchak was operating out of a satellite

15  office in D.C. monitoring individuals in a chat room on a

16  social networking site.  The chat room was frequented by

17  individuals who had a sexual interest in prepubescent

18  children.

19        On that date, February 1st of 2012, Detective

20  Palchak received a private instant message from an individual

21  using the screen name Vet Guy Z06, later identified as the

22  defendant, Dr. Hite.

23        Dr. Hite and Defendant [sic] Palchak discussed some

24  mutual interest in sexual activity with minors.  Detective

25  Palchak informed Defendant Hite or Dr. Hite that he had

1    limited sexual experience with his three-year-old nephew, and

2    that he was fully active sexually with his girlfriend's

3    12-year-old daughter.

4            Dr. Hite and Detective Palchak exchanged various

5    Yahoo instant messenger screen names.

6            Later on February 1st, 2012, Dr. Hite and Detective

7    Palchak continued communicating via Yahoo instant messenger

8    after Dr. Hite had reinitiated the conversation with Detective

9    Palchak, again using the Yahoo display name Black Corvette.

10            During the course of the private Yahoo instant

11    messenger chat Dr. Hite and Detective Palchak discussed

12    engaging in sexual activity with Detective Palchak's

13    girlfriend's 12-year-old daughter and scheduling a potential

14    meeting for that purpose.  The child was a fictitious one.

15            Detective Palchak sent Dr. Hite a photo of the

16    12-year-old girl via the Yahoo instant messenger.  Dr. Hite

17    agreed to allow Detective Palchak to show the 12-year-old girl

18    a photo of himself, and later asked, "Let me know what she

19    thinks."

20            On February 3rd of 2012, again during Yahoo instant

21    messenger communication, Dr. Hite and Detective Palchak

22    discussed engaging in sexual activity with the 12-year-old

23    daughter of Detective Palchak's alleged girlfriend, and

24    scheduling a potential meeting for that purpose.

25            Dr. Hite and Detective Palchak also discussed

1    engaging in sexual activity with Detective Palchak's alleged

2    three-year-old nephew.  Dr. Hite provided his phone number to

3    Detective Palchak.

4              Between February 6th, 2012 and February 14, 2012,

5    during subsequent communications Dr. Hite and Detective

6    Palchak discussed engaging in sexual activity with the

7    three-year-old nephew and meeting for that purpose.  These

8    discussions included Dr. Hite and Detective Palchak meeting on

9    a Friday evening, engaging in sexual activity with the

10   three-year-old nephew the following day.

11             They also included Dr. Hite's suggestion that they

12   use, quote, a jar of peanut butter and grape jelly premixed

13   during sexual activity with the three-year-old nephew.

14             On February 14th, 2012, Dr. Hite and Detective

15   Palchak spoke by telephone concerning plans to meet later that

16   week in the District of Columbia.

17             On February 16th, 2012, Dr. Hite and Detective

18   Palchak continued to communicate on the Yahoo instant

19   messenger.  They continued to discuss engaging in sexual

20   activity with the three-year-old nephew, again about meeting

21   in D.C.

22             They also agreed to communicate the following day,

23   which would have been Friday, February 17th, prior to the

24   meeting.

25             On Friday, February 17th, Dr. Hite and Detective

29

1  Palchak spoke by phone as opposed to the Yahoo instant
2  messenger.  Dr. Hite expressed reluctance to travel to D.C. as
3  previously discussed, he wanted a little bit more
4  confirmation.  He obviously was concerned about who it is that
5  he was meeting.

6        After Detective Palchak indicating that he would be
7  willing to do a webcam with the nephew indicating that on the
8  webcam he engage in sexual activity so that Dr. Hite could see
9  it, Dr. Hite responded, "Okay, fabulous."  Dr. Hite then
10  stated, "I was hoping that you would suggest something like
11  this."

12        Dr. Hite and Detective Palchak agreed that the
13  webcam session with the three-year-old nephew would take place
14  in the morning after which Dr. Hite would travel to D.C. to
15  meet Detective Palchak and the three-year-old nephew.

16        They discussed the weather forecast.  Dr. Hite
17  discussed which vehicle he would be using to visit D.C.  Dr.
18  Hite was arrested that evening near his home in Richmond,
19  Virginia.

20        And during the search of Dr. Hite's home in
21  Richmond, law enforcement recovered a sealed and unopened jar
22  of Smucker's Goober Grape Peanut Butter and Grape Jelly
23  Stripes matching the description that was discussed during the
24  communications.  It was located near a pair of sunglasses on
25  top of the washing machine or dryer in the laundry room next

1   to the garage.

2          They also recovered an HP laptop computer, I won't

3   put the numberer in, model number, from Dr. Hite's home.

4   Forensic analysis of Dr. Hite's HP laptop computer determined

5   that Dr. Hite had used the computer to communicate with

6   Detective Palchak via the Yahoo instant messenger.

7          Forensic analysis of Dr. Hite's laptop computer

8   further determined that between at least October 2009 and

9   March of 2011, approximately 409 images or files of child

10  pornography were located on an external storage drive that had

11  been connected to the computer.  Dr. Hite knew that the

12  external storage drive contained child pornography.  These

13  files included depictions of prepubescent boys and

14  prepubescent girls engaging in sexual explicit conduct and

15  sexual acts with themselves, each other and adult men.

16          Additionally these files were produced using

17  material that had been mailed or shipped in interstate

18  commerce.  So that meets all of the elements of the offense

19  and sets out what Dr. Hite had agreed to in terms of the

20  facts, in which case the Court found as the offense conduct

21  that was met it beyond a reasonable doubt.

22          I've set out the offense conduct.  I admitted some

23  of the specifics and explicit details of the sexual activities

24  that were -- that defendant wanted to engage in with each of

25  the minors as he described in the chats.  These two offenses

 1  are clearly very serious offenses, although it's obvious that

 2  the 12-year-old and the three-year-old boy were fictitious,

 3  Dr. Hite didn't know that when he was discussing the plans to

 4  engage in sex with those minors.  And when he agreed to meet

 5  Detective Palchak or to have the sex with the minors which had

 6  been described.

 7          Dr. Hite wanted to meet Christie, who was the

 8  alleged 12-year-old girl.  Then he started talking about the

 9  three-year-old boy.  Plans were made to meet over a period of

10  time.  They move from the girl to the three-year-old nephew.

11          Dr. Hite was wary and cautious about these

12  arrangements, understandably so.  He was concerned that

13  Detective Palchak, who was known as JP, was law enforcement,

14  which it turned out he was.  And the defendant agreed to meet

15  and come over on Friday.  Then he got cold feet, but once the,

16  Detective Palchak, JP, suggested the webcam session, then Dr.

17  Hite was again discussing plans to meet.  His fears were

18  allayed, and he was prepared to go forward with the sexual

19  conduct.

20          Dr. Hite didn't change his mind or hesitate about

21  wanting to engage in sex with the minors.  His hesitation was

22  really due to the fear of being caught.  And I do note that

23  Detective Palchak gave the defendant at least two

24  opportunities to back off from these arrangements.

25          Now, in addition to the above, on the thumb-cache

1  found in defendant's home, there were photos found that also

2  would meet the definition of the child pornography.  As I've

3  indicated there are approximately 409 images.  I've looked at

4  24 of them as part of the trial.  For many of them, they were

5  not able to identify them, but for some of the images they

6  were able to identify them as real children abused and

7  degraded in these images.  And we've talked about those, that

8  presumably the ones that they've requested restitution.

9          Obviously, the Victim Impact Statements weren't

10 going to be of the fictitious children in this case, it would

11 be related to the child pornography that was shown.  But it

12 does support the proposition that real children, when abused

13 sexually, whether through images or actual sexual conduct by

14 adults, are at minimum damaged emotionally, in some cases for

15 life, and certainly have trust issues with adults and with

16 relationships generally.

17         The sexual conduct Dr. Hite described and proposed

18 to engage in with these two minors, had it actually taken

19 place, would have certainly have caused harm to them.  And the

20 only reason for doing this is his own gratification in terms

21 of makings these arrangements.

22         Now, he's accepted responsibilities for these two

23 offenses.  I went over the statement of offense pretty much as

24 it had been agreed to so that there would not be anything else

25 since I was –– presided over the trial and there obviously was

1    evidence beyond that, and so I wanted to be very accurate

2    about exactly what he had agreed to as to the two offenses.

3            I think that a Rule 11(c)(1)(C) sentence is a

4    reasonable one and appropriate.  It does, I think, reflect the

5    3553 factors, the 24 months with the D.C. voluntary advisory

6    guidelines, and the 60 months, although it's less, put

7    together it's still within the federal guidelines.

8            And I think under the circumstances in terms of not

9    going through the trial, we also had certainly a number of

10   issues that were contested that would have needed to be

11   resolved as part of it, so all of those resources were saved

12   by having the plea.  And as I said, he did accept

13   responsibility as I've outlined in the summary of the offense.

14           So the only other issue, having accepted what has

15   been proposed as the sentence, is the restitution.

16           I'm going to do a written order in this case as,

17   although it initially started out more contested than it's

18   ultimately came down to, I'm going to discuss this in more

19   summary form.  This area is very difficult.  Only recently

20   have we -- we have victims, and I've been doing child

21   pornography cases for awhile, and only recently have we had

22   real requests for restitution, some more guidance from the

23   Supreme Court about how to do it, it is still very murky.  It

24   is not -- they're not easy decisions to make, and the factors

25   are not very, depending on the defendants [sic].

1          So I'm going to set out what I looked at.  I will

2     do it in more summary form for the ones that were agreed to,

3     but I have learned that even if they've agreed to it, it's

4     still important to put something on the record about it.

5          I am going to do something in writing; however, I

6     think it would be helpful, frankly, for other cases, whether I

7     get some of my own or others, in terms of looking at the

8     cases, the comparisons, the factors, how you would consider it

9     and the kind of information that you actually get and how you

10    would weigh it.  So I'm not going to just leap to the end in

11    terms of indicating what's agreed to and that's it.  I think I

12    need to, even though it's agreed to, to still put on the

13    record some of the information that the Court needs to

14    consider when you're doing restitution.

15         So, the relevant conduct related to the restitution

16    issue, the forensic analysis of Dr. Hite's laptop computer

17    determined that, and there's particular dates which are

18    important, between October 2009 and March 2011, approximately

19    the 409 files of child pornography located on the external

20    storage drive that had been connected to Dr. Hite's computer.

21         He's admitted that the storage drive contained

22    child pornography; that the files included depictions of

23    prepubescent boys and prepubescent girls engaging in sexually

24    explicit conduct with themselves, each other and adult men.

25         The images of the victim in the Misty, 8 Kids

 1  series, Sponge B series and Angela were included in the 409.

 2  The Government filed a motion seeking restitution, and it's

 3  sort of an interesting aspect.  They filed the restitution,

 4  the families either filed separately or filed it through the

 5  Government, and although it's the burden of the Government to

 6  go forward, it's the families that are actually asking for the

 7  restitution specifically.

 8          So it's sort of an interesting relationship in

 9  terms of what you get, in terms of what they put in the

10  pleadings, which is why I asked for some additional

11  information from the Government, which to some degree would

12  come from them, but also come from the family in terms of

13  trying to make a decision here.  And so they're seeking

14  restitution for the five victims from these various series.

15          The parties agree that both 18 U.S.C. Section 2259

16  and the Supreme Court holdings in *U.S. v. Paroline* controlled

17  my determination on the restitution issue.

18          So the 20 -- Section 2559(b)(3) provides for

19  recovery of the full amount of the victims' losses, and then

20  sets out the kinds of things you would look at.  Medical

21  service relating to physical, psychiatric or psychological

22  care, physical and occupational therapy or rehabilitation,

23  necessary transportation, temporary housing and childcare

24  expenses, lost income, attorneys' fees, as well as other costs

25  incurred, and any other losses suffered by the victim as a

1    proximate result of the offense.  And so you have to look

2    carefully.  The offense is not the production of the

3    pornography, but strictly the possession, so you need to make

4    that distinction.

5            In *Paroline*, the Supreme Court examined, quote, how

6    to determine the amount of restitution a possessor of child

7    pornography must pay to the victim whose childhood abuse

8    appears in pornographic materials possessed, unquote.  And the

9    Court held that the restitution is proper under 2255 only to

10   the extent the defendant's offense proximately caused the

11   victims' losses.

12           So you have to look at the materials, and this has

13   created some issues in some of the cases to make sure that

14   it's proximately caused by the actual offense, which in this

15   case is the possession, and not the production of the original

16   material or the requirement for the original abuse.

17           The Supreme Court specifically addressed instances,

18   quote, where it can be shown both the defendant possessed the

19   victims' image, and that a victim has outstanding losses

20   caused by the continuing traffic in those images, but where

21   it's impossible to trace a particular amount of those losses

22   to the individual defendant by recourse through a more

23   traditional causal inquiry, which is very true.

24           So it sets out certain things.  The Government has

25   the burden of establishing the amount of the loss, the amount

 1   of restitution.  It's described as restitution in an amount

 2   that comports with the defendant's relative role in the causal

 3   process that underlies the victim's general losses.  And they

 4   also indicate the restitution couldn't be severe nor a token

 5   or nominal.

 6            And the test that would be applied, I explained

 7   that a district court first must determine the victims' losses

 8   arising out of the continued traffic, in this particular case

 9   are the pornographic images.  The Court then identified seven

10   factors that are useful for the determination of the relative

11   causal significance of the defendant's conduct.

12            They caution that if these factors are not a rigid

13   formula they're to give a rough guidepost to decide the amount

14   that fits the offense.  And it's an exercise in discretion in

15   fashioning the restitution order.

16            So I'll look at the factors in reaching a decision.

17   There doesn't -- and I looked at what was contested and what

18   wasn't.  The parties don't contest that Dr. Hite owes

19   restitution to the victims for their losses that are the

20   proximate cause of his conduct.  And Dr. Hite knowingly

21   possessed the 409 files of child pornography.  We've already

22   indicated that either Dr. Hite has agreed or conceded that the

23   certain of the victims were identified in the 409 and that the

24   number of images depicted those particular victims.

25            I've also found that the proffer as to the two

1   remaining victims, that those, based on the proffer by a

2   preponderance of the evidence, also meets the -- their

3   requirement to have an evidentiary predicate for identifying

4   the victim and identifying the number of images that depict

5   the victim.

6         Each victim in this case provided me with material

7   documenting the harm he or she suffered.  Amy in the Misty

8   series, and she's the victim that's submitted a victim impact

9   report detailing the trauma she experienced as a result of the

10   continued circulation of images of the abuse that was

11   originally perpetrated against her.  And the issue here is a

12   constant never ending, and I must say that at least two of

13   these victims I've seen in other cases, and obviously, it's,

14   you know, over the years these images don't disappear.  They

15   keep getting shown, and from the victims' perspective, it's a

16   re-abuse in terms of knowing that it's out there and other

17   people are viewing it, and they're depicted in these abusive

18   situations.

19         She was evaluated by Dr. Silverberg in 2008, who

20   indicated that the sexual assault perpetrated against the

21   victim, its continued memorialization in pictures, which

22   continue to be traded, affect her in a variety of ways, has

23   had a long-lasting life-changing impact on her.  She has

24   post-traumatic symptoms from this, and they've been fairly

25   resistant to treatment because of her awareness of the

1    continued existence of the photos.

2            And I won't get into something else.  She's

3    indicated that Amy will require weekly therapy, and that there

4    will be a period when more intensive inpatient rehabilitation

5    services will be required over the course of her lifetime.

6    She, Dr. Silverberg provided an updated one in December

7    of 2014, indicating that although progress had been made, that

8    she continues to -- Amy continues to suffer from the ongoing

9    effects or victimization from the child abuse, and importantly

10   from the continued use of her image by child pornography

11   viewers, traders and abusers.  She recommended continued

12   treatment and monitoring of the psychological functioning.

13           There was also an economic report calculating the

14   value of certain losses subsequent to the sexual exploitation.

15   I'll get into that later.

16           John Doe's 2 and 4 in the 8 Kids series:  John Doe

17   2 was examined by Dr. Mike -- Mark, excuse me, Whitehill in

18   March of 2014.  Dr. Whitehill noted that John Doe 2 reported

19   that he continues to be disturbed by what happened to him, as

20   well as the knowledge that others continue to be able to

21   witness his abuse.  The doctor opined that not only did they

22   suffer from are the original trauma, but also from the

23   knowledge that the evidence of that abuse is never going to be

24   erased based on the all pervasive scope of the Internet, and

25   set out a mental health life care plan developed to estimate

1   the cost of restorative therapy for John Doe 2.  There was

2   also a Victim Impact Statement detailing the negative effects

3   of the ongoing circulation of the images.

4           John Doe 4's mother provided a Victim Impact

5   Statement describing the negative impact and the continued

6   circulation.  There was also an economic report that was

7   submitted again analyzing the economic loss.

8           Andy in the Sponge B series, Dr. David Corwin

9   provided an evaluation dated March of 2014 indicating that

10  Andy expressed -- I won't use his exact thing, but obviously

11  distressed with thoughts about not knowing if someone had seen

12  him on the Internet and that he worries that people are seeing

13  it.

14          Dr. Corwin indicated Andy will require

15  psychotherapy and treatment for substance abuse because of the

16  additional stress of being sexually abused and exploited by

17  the Internet distribution of the pornography featuring sexual

18  abuse has impaired his learning, educational assistance and

19  vocation rehabilitation services that he needs to be provided.

20  They also provided an economic report.

21          Angela in the Angela series, Dr. Alexander Doyle

22  completed a psychological evaluation in May of 2014 indicating

23  the abuse of experiences, both the abuse and the exchange of

24  the images occurred during a time of important brain

25  development for Angela and can be expected to continue, the

1   victim to experience the effects of the experiences for the

2   remainder of her life.  The doctor projected Angela's

3   treatment needs over the next 20 years, including outpatient

4   individual therapy, medication evaluation and management,

5   collateral family therapy, marital therapy, group therapy for

6   victims of child sexual abuse and educational opportunities.

7   We also received a Victim Impact Statement from Angela's

8   mother.

9         So based on the information in the record, I'll

10   find that Dr. Hite's offense conduct has caused harm to the

11   five individuals seeking restitution in the case, and

12   therefore they can have recover restitution.

13         The economic losses for each of the victims, the

14   victims each submitted materials documenting their economic

15   losses.  Dr. Hite has agreed that the Government has carried

16   its burden establishing the aggregate amount of losses, which

17   doesn't get to the ultimate figure for each of the victims.

18         For Misty, I would indicate she was abused when she

19   was between eight and nine years old.  The amount is

20   $3,367,854.  Without breaking it down -- breaking it down,

21   excuse me, lost wages and cost of future therapy.  The eight

22   kids series, they -- John Doe 2 is the -- the abuse was when

23   he was nine to ten years old.  John Doe 4, he was five years

24   old.  John Doe 2 is $988,304.  Loss of earning potential and

25   future medical and rehabilitation costs were split.  For John

42

1  Doe 4, his loss of earning potential and future medical and

2  rehabilitation costs.  Again, there seems to be an acceptance

3  of this.

4       Sponge B, which she was -- well, I should say the

5  victim in Sponge B, the ages of the abuse were between seven

6  and 11 to 12 years old.  The amount is $2,121,963, a

7  combination of lost wages, future therapy.

8       Angela was abused within ages of four to six, the

9  range is 366,000 to 587,000.  And it includes over 20 years

10  outpatient individual therapy, medical evaluation and

11  management, collateral family therapy, marital therapy, group

12  therapy, and educational opportunities.  So the victims have

13  put different things in.

14       It doesn't appear that Dr. Hite is disputing the

15  amounts of the economic totals in terms of the losses, and

16  based on the Court's view of other cases, they certainly sound

17  well within the amounts that the Court would have expected

18  associated with the length of time and the types of

19  restitution and economic losses that you would need.

20       In terms of the *Paroline* factors, let me go through

21  each of them.  The first is the number of past criminal

22  defendants found to have contributed to the victims' general

23  losses.  The victim in the Misty series has had 198 previous

24  restitution orders.  The victim in the 8 Kids series has had

25  132 previous restitution orders.  The victim in Sponge B

1    series, 31 previous restitution orders.  The victim in the

2    Angela series, 106 previous restitution orders.  We don't

3    know -- we know that the number of orders, it's not clear for

4    some of them exactly how they played out in terms of how they

5    would have come to the calculations.

6              Reasonable predictions of the number of future

7    offenders likely to be convicted for crimes contributing to

8    the victims' general losses, the Government provides no

9    estimate, doesn't have sufficient reliable data.  So that the

10   Court accepts and doesn't consider.

11             Any available and reasonably reliable estimate of

12   the broader number of offenders involved, most of whom will,

13   of course, never be caught or convicted.  Again, the

14   Government provides no estimate indicating there's no way to

15   calculate this, nor do they have any data from which you could

16   extrapolate the number of undetected possessors and traders,

17   and I'll accept that, and that is not -- isn't going to be

18   factored in.

19             Whether the defendant reproduced or distributed

20   images of the victim, there's no evidence that the defendant

21   either reproduced or distributed any victims -- images of the

22   victims, so that is, the Court isn't considering.

23             Whether the defendant had any connection to the

24   initial production of the images, uncontested.  Defendant had

25   no connection.

1    How many images the victim possessed, they have
2  agreed to with uncontested.  Misty, four images.  Eight Kids,
3  14 images.  Total 11 of John Doe 4, and three of John Doe 2
4  and 4 together.  That was not uncontested, but the Court has
5  made a finding based on the proffer.  Sponge B series, four
6  images, which is uncontested.  And Angela series at this
7  point, two images.

8    There's other information that's relative to the
9  causal role, and this I would view as uncontested.  There's no
10  evidence the defendant knows any of the victims, attempted to
11  discover their identities or attempted to contact them.
12  There's no evidence the defendant knows the victim, attempted
13  to discover, is not aware of any efforts by the defendant to
14  groom other minors for -- minors for sexual exploitation using
15  the images, and just that the amount -- the number of images,
16  which is the 409.

17    The general points that I would go through that in
18  terms of trying to indicate what's agreed to and what isn't,
19  the parties agree that Dr. Hite is required to pay an amount
20  of restitution that's not token or nominal, but not severe.
21  The Government asserts that the amount for each victim should
22  exclude losses incurred prior to Dr. Hite's possession, which
23  would have been in 2009, and exclude losses attributable to
24  the original abuse as opposed to the child pornography
25  charges.  Again this is uncontroverted by both sides.

1    I've also received from the Government, as well as

2   to some degree from the defense, restitution orders provided

3   to these victims in Federal District Courts in other cases.

4   Evidently DOJ keeps track of restitutions awarded to child

5   pornography victims in cases they've prosecuted in Federal

6   District Courts.

7    I would point out it's unknown whether these

8   restitution amounts were or will be upheld on appeal, some are

9   still pending, some aren't, whether the restitution was or

10   will be collectible once the offenders have completed their

11   terms of incarcerations.

12    Cases relied on by the parties, *U.S. v. Moreira*,

13   M-O-R-E-I-R-A, it's in the materials.  I would just point out

14   the issues within them.  Judge Huvelle ordered restitution for

15   the victim in the Misty series, and the Misty series is in

16   mine as well, in the $5,800.  However, I would point that this

17   was a consent order, and it was also decided before the

18   Supreme Court's *Paroline* issue.  So it provides some use, but

19   not an enormous amount.

20    *U.S. v. Monzel*, M-O-N-Z-E-L, Judge Kessler has not

21   entered a restitution order in this case.  Two prior

22   restitution orders were vacated by the D.C. Circuit, and a new

23   one has not been entered, it's under advisement.

24    *U.S. v. Massa*, M-A-S-S-A, the defendant did plead

25   guilty to one count of possession.  The defendant was ordered

1   to pay restitution in the amount of 8,000 to the victim of the

2   Angela series, 8,000 to the victim in Misty, and 1,000 to the

3   victim in Sponge B.  In this case the District Court noted

4   that the defendant was found to possess images with 18,070

5   identifiable victims.  Eighty-five were Angela, 73 Misty, and

6   two were Sponge B, so they obviously were greater.

7           *U.S. v. Bellah*, B-E-L-L-A-H, defendant pled guilty

8   to one count of transportation of child pornography, which is

9   a different charge.  The Court ordered restitution in the

10   amount of $7500 each for John Doe 2 and 4.  And 5,000 for the

11   victim in Sponge Bob B series.  That case, the defendant had

12   68 images of John Does, and I think there were one through

13   five, we just have two of them in the 8 Kids series, and three

14   videos and eight images of the victim in Sponge B or Sponge

15   Bob.  And in that case the -- indicated the number of images

16   was an important factor in making a decision here.

17           So, getting back to my specific ones, we have four

18   images in the Misty.  It's been agreed to, the victim

19   requested $5,000, Dr. Hite originally indicated $2,900.  The

20   range of awards have been between $50 to $3 million, whatever,

21   187 of the 197 cases were $50 to 50,000.  And I think it

22   depend -- we took out sort of the outliers.  The total

23   estimated losses I've gone through.

24           I will not set out the arguments, both the

25   Government, Dr. Hite had made distinctions with it.  There now

1  has been a -- reached an agreement between the parties and

2  presumably the victim's family, so I'll order Dr. Hite to pay

3  $5,000 in restitution to the victim of the Misty series.  I

4  would point out that the damages were quite detailed, and the

5  total damages were quite a bit higher.

6         In the 8 Kids series, the requested amounts were --

7  there were 11 images of John Doe 4 and three of John Doe 2,

8  and four together.  The victims wanted $25,000 per each

9  victim.  Dr. Hite's position is that it should be $2500 for

10 each victim. There were 132 cases involving, and the range of

11 awards were from $50 to $37,500.  Sixty to 66 of the awards

12 were $50 to $16,000, and I've already indicated the economic

13 damages.

14        The Government did indicate that John Doe 2 has

15 continued vulnerability based on the knowledge that others

16 continue to be able to witness his abuse.  The economic loss

17 reports.  Dr. Hite relied on *U.S. v. Bellah* to support his

18 request for restitution.  In that case the Court awarded

19 $7,500, but there were 68 images from that series.  And so

20 they're requesting $2,500 per victim, when Dr. Hite had 14

21 images, and he viewed that as reasonable in his view.

22        I will accept the request that Dr. Hite has made of

23 the $2,500 to John Doe 2 of the 8 Kids series, and $2,500 to

24 John Doe 4 of the 8 Kids series.

25        In comparing it to the other, it was not as

1  specific and as broken down in terms of the damages,

2  particularly in differentiation relating to the possession of

3  pornography as opposed to the original abuse.  Although it was

4  there, it was not as clearcut as some of the other material

5  that I received on the other victims.  And the total damages

6  were less than some of the other victims.

7       The Sponge B or Sponge Bob series, four images.

8  Victim wanted $5,000.  The victim's position, former position,

9  they had -- one had quite a bit more, they evidently dropped

10  out some money associated with what sounded like attorneys'

11  fees, it wasn't quite clear to me what those additional

12  expenses were.

13       Dr. Hite's position was $2,500.  Number of total

14  cases, which is lower than the rest, is 31.  Range of awards

15  have been $1 million to $10,000 -- $1,000, excuse me, to

16  $10,000.  I've already indicated the economic loss that was

17  set out in this particular case.  The Court orders Dr. Hite to

18  pay $5,000, which is the agreed to restitution, to the victim

19  in the Sponge B series.

20       In the Angela series, which had two images, the

21  requested amounts, victim's position was $11,980 and $16,400

22  roughly.  Dr. Hite's position was $1,200.  There were 106

23  cases, the awards ranged from $18.30 to $29,859.  I've

24  indicated the economic loss, and the Court will order Dr. Hite

25  to pay $1,750, which is an agreed to amount in restitution to

1    the victim of the Angela series.

2         I have to say that it was, since it initially

3    started out as contested, I spent a lot of time going through

4    this.  This is a very tough area to do in terms of,

5    particularly if there's any that's contested in terms of

6    trying to come up with amounts that -- and to factor in all of

7    the different materials, and it takes quite a bit of time to

8    review the impact statements.  And in this particular case it

9    was very important to try and separate out, because other

10   courts have had problems, if they have not made the

11   distinction between the possession versus other particular

12   charges related to it.  So I tried to go through all of that

13   and make sure that I was looking at it in that context.

14        All right.  In terms of the sentence itself, it's

15   the judgment of the Court that you, Paul David Hite, are

16   hereby committed to the custody of Bureau of Prisons for

17   consecutive terms of 60 months or five years on Count 1, and

18   24 months or two years on Count 2.

19        You're further sentenced to serve concurrent terms

20   of 120 months, which is ten years, of supervised release on

21   each count, and to pay a $200 special assessment and $250 fine

22   for Count 1, and $12,100 for Count 2.  You'll get credit for

23   time served, which they will be calculating.

24        The special assessment and fine for Count 1 are

25   immediately payable.  Within 30 days of any charge of address

1   you shall notify the Clerk of the Court of the change until

2   such time as the financial obligation is paid in full.  I'm

3   waiving any interest or penalties that may accrue on unpaid

4   balances.

5              The special assessment and fine for Count 2 are to

6   be made payable to the Criminal Finance Office and there's an

7   address associated with D.C. Superior Court for a deposit into

8   the Crime Victims Compensation Fund.  Within 72 hours of

9   release from custody you'll report in person to the Probation

10  Office in the district to which you're released.

11             While on supervision you shall not possess a

12  firearm or other dangerous weapon; you shall not use or

13  possess an illegal controlled substance; you shall not commit

14  another federal, state or local crime; also abide by the

15  general conditions of supervision adopted by the U.S.

16  Probation Office, as well as the following special conditions.

17  A number of these special conditions were reached in agreement

18  as part of the plea.

19             The fine payment, which we talked about, if they're

20  not fully paid off, the balance of any fine shall be paid at a

21  rate of not less than a thousand each month and providing

22  verification to the Probation Office.

23             Financial disclosure.  You'll provide the Probation

24  Office with your income tax returns, authorization for release

25  of credit information and information about any business or

 1  finances in which you have control or interest until the fine
 2  is satisfied.
 3           The following ones relate to ones that were agreed
 4  to.  And speak up if I'm wrong about this, but in going back
 5  it looked to me like it was the wording we already had.
 6           You'll comply with the sex offender registration
 7  requirements for convicted sex offenders in any state or
 8  jurisdiction where you reside, are employed, carry on a
 9  vocation or are a student.
10           Contact restriction.  You shall have no
11  unsupervised contact with minors under the age of 18 of more
12  than momentary duration without the written consent of the
13  U.S. Probation Office.  However, you shall be permitted
14  supervised visitation with your niece and nephew, provided
15  that both parents of your niece and nephew provide a one-time
16  written consent to the U.S. Probation Office and the Court
17  consenting to such supervised visitation.
18           In terms of the search, pursuant to the Adam Walsh
19  Child Protection and Safety Act of 2006, you shall submit to a
20  search of your person, property, house, residence, vehicle,
21  papers, computer, other electronic communication or data
22  storage devices or media and effects at any time, with or
23  without a warrant, by any law enforcement or probation officer
24  with reasonable suspicion concerning unlawful conduct or a
25  violation of a condition of supervision.

1            Employment restriction.  You shall not be employed

2   in any capacity or participate in any volunteer activity which

3   may cause you to come in direct or unsupervised contact with

4   children, except under circumstances approved in advance by

5   the U.S. Probation Office.

6            Computer Internet search monitoring.  You shall

7   identify all computer systems, Internet capable devices, and

8   similar memory and electronic devices to which you have access

9   and allow installation of a computer and Internet monitoring

10  program.

11           You shall provide the Probation Office with your

12  income tax returns, authorization for release of credit

13  information and the other information in terms of which you

14  have an interest.  I think that's a duplicate of the other

15  one.

16           The Sex Offender Assessment and Treatment.  You

17  shall participate in a program of sex offender assessment and

18  treatment as directed by the U.S. Probation Office.  At the

19  direction of the U.S. Probation Office, you shall pay for all

20  or a portion of any treatment program.  You shall waive your

21  right of confidentiality and treatment and sign any necessary

22  releases for any records imposed, as a consequence of this

23  judgment, to allow the U.S. Probation Office to review your

24  course of treatment and progress with the treatment providers.

25  And what would be provided would be related to the sex

1  offender treatment, not other issues that might be dealt with.

2        I believe those are all the ones that were agreed

3  to; am I correct?  Were there any that I either omitted and/or

4  described differently, from either party?

5        MR. POLLACK:  Your Honor, there was --

6        THE COURT:  One thing they did not put in is the

7  polygraph testing, which was agreed to as one of the terms.

8        MR. POLLACK:  Your Honor, there was also a

9  condition, if the Court covered it, I must have missed it, but

10 regarding travel, that the defendant is not to leave the

11 judicial district in which he's supervised without permission

12 of the Court or the probation officer, except that he may

13 travel outside the judicial district in which he is supervised

14 as long as he's within the Commonwealth of Virginia within

15 24-hours notice to the supervising probation officer.

16        THE COURT:  Okay.  I see that.  So we would add to

17 these the issue that --

18        THE PROBATION OFFICER:  Your Honor, those are not

19 actually special conditions of supervision.

20        THE COURT:  Okay.

21        THE PROBATION OFFICER:  Those are standard

22 conditions of supervision.

23        MR. POLLACK:  Well, Your Honor, this one is not --

24        THE COURT:  I think the point that we're making is

25 that he's agreed to them.  Okay?  In other words, it's an --

```
 1  there are issues occasionally where the Court orders them and
 2  they may be standard ones, but I'm trying to point out that he
 3  actually agreed to these; not all defendants do.
 4          MR. POLLACK:  In this case, Your Honor, this is not
 5  the standard condition, it's a deviation from the standard
 6  condition.
 7          THE COURT:  In terms of his leaving the judicial
 8  district.
 9          MR. POLLACK:  Correct.  Because it allows him to
10  leave the judicial district of supervision as long as it's
11  within the Commonwealth of Virginia.  In other words, he could
12  travel from the Eastern District to the Western District with
13  24-hours notice --
14          THE COURT:  Twenty-four-hours notice.
15          MR. POLLACK:  -- as opposed to requiring
16  permission, which would be the standard condition.
17          THE COURT:  Okay.  So if you look at the Page 8 of
18  the plea agreement.
19          THE PROBATION OFFICER:  I have that.  And it's in
20  the Presentence Report, Paragraph 22.
21          THE COURT:  But it's --
22          THE PROBATION OFFICER:  All those were set forth in
23  Paragraph 22.
24          THE COURT:  Okay.  But my assumption is that we
25  would wish to put this in here so that it's clear that that's
```

1    something he can do.  I've agreed to it as had -- so are you

2    indicating to me it should not be in there?

3                    THE PROBATION OFFICER:  Those -- all of the

4    conditions that are listed --

5                    THE COURT:  Let me ask it this way:  A, which is

6    Page 8 of 17, is that a standard condition for you?  I don't

7    think so.

8                    THE PROBATION OFFICER:  Yes.  Those are standard.

9                    THE COURT:  The travel?

10                   THE PROBATION OFFICER:  The travel is -- it depends

11   on which jurisdiction he's released to.  Right now we have no

12   idea which jurisdiction --

13                   THE COURT:  Well, let's assume he's in Virginia,

14   that's where he plans on --

15                   THE PROBATION OFFICER:  Then he would be supervised

16   in Virginia, so he would be under their jurisdiction.

17                   THE COURT:  I know, but you're missing my point.

18   My point is, I'm asking -- what he's indicating is -- defense

19   counsel by "he" -- is that this was agreed to by the

20   Government, the defendant and the Court, and, therefore, it

21   may or may not be the standard provision, I want it in here so

22   there's no dispute.

23                   THE PROBATION OFFICER:  Yes.  If you would like for

24   him to be able to travel within the Commonwealth of Virginia,

25   then you can put that in.

1            THE COURT:  All right.  So I will add that.  So let

2    me read it into the record so it's in the record.  The

3    defendant shall not leave the judicial district in which he's

4    supervised without the permission of the Court or Probation

5    Office, except he may travel outside the judicial district in

6    which he's supervised within the Commonwealth of Virginia with

7    24-hours notice to the supervising probation officer of where

8    he will be traveling and when he will return.  So if that

9    would be added to this, I would do that.

10           The other one that does need to be -- I don't know

11   how I missed this.  That he shall submit to polygraph testing,

12   unless you don't want that.

13           THE PROBATION OFFICER:  It's a standard condition

14   of the sex offender treatment.  It's a standard tool used in

15   sex offender treatment.

16           THE COURT:  Okay.  So by agreeing to participate in

17   this, you're in essence saying he's agreed to the polygraph

18   test.

19           THE PROBATION OFFICER:  You may add the polygraph

20   testing at the end of the sex offender treatment as a special

21   condition.

22           THE COURT:  All right.

23           MR. POLLACK:  And just so I'm clear, Your Honor, he

24   is not agreeing necessarily to polygraph testing, what he's

25   agreeing to is to participate in the program.  And so to the

1    extent that that is part of the program, that's part of --

2         THE COURT:  Well, I have to say to you that the

3    plea letter says, "Your client shall submit to polygraph

4    testing as directed by the Probation Office."  This is Number

5    R on Page 10.  But it is a standard tool, shall we say, in the

6    sex offender assessment because otherwise it's just --

7         MR. POLLACK:  You're correct, Your Honor.  It

8    appears in two different places.

9         THE COURT:  Right.

10        MR. POLLACK:  So it appears in P to the extent that

11   it's part of the program, but you are correct.  Separately he

12   shall submit if he's directed to do so by the Probation

13   Office.  That is correct.

14        THE COURT:  Right.  Okay.  I'm going the add it

15   only once, and I'll put it into the sex offender assessment

16   and treatment.

17        MR. POLLACK:  That's fine, Your Honor, and then

18   finally, the Court had indicated, and I think this pertained

19   to the Internet monitoring, that there was a place where you

20   were saying that the client would pay the costs associated.  I

21   may have it wrong as to which provision that applied to, but

22   in any event --

23        THE COURT:  No.  It's the sex offender assessment

24   and treatment.  I think really that's the only one that we had

25   with costs.

1              MR. POLLACK:  Okay.  Your Honor, we had discussed

2    this at the time of the plea colloquy.  Because in this case

3    the fine is already at the statutory maximum, he cannot be

4    ordered to pay costs of these programs on top of that.  And so

5    that would not be a legal condition to impose.

6              THE COURT:  Okay.  I will take out in terms of

7    anything relating to the payment.

8              MR. POLLACK:  That's all I had, Your Honor.

9              THE COURT:  Okay.  Anything from the Government?

10             MR. KENT:  Yes, Your Honor.  And this goes back to

11   the polygraph testing.

12             THE COURT:  Okay.

13             MR. KENT:  The Government would like, and as

14   indicated in the plea agreement, the polygraph testing

15   requirement to be its own stand-alone requirement and not be

16   limited to the context of the sex offender assessment and

17   treatment provision.  As it reads now, it says:  Your client

18   shall submit to polygraph testing as directed by the United

19   States Probation Office.  Certainly in the agreement, and it's

20   the Government's view, that this would allow the U.S.

21   Probation Office request and require the defendant to undergo

22   polygraph testing, certainly to ensure compliance with the

23   supervision, certainly for other reasons.  To include that

24   within the sex offender assessment and treatment section,

25   however, it would essentially read that that requirement is

1   only limited to the context of that treatment and not broader.

2          THE COURT:  Okay, all right.  I can see what you're

3   indicating.  So it would be the polygraph is part of the

4   treatment, which is correct, but you're asking for the

5   stand-alone.  Do you want to respond?  I have to say, it's in

6   two places, and one looks like it's connected to the treatment

7   and the other one looks like it's at the U.S. Probation Office

8   in terms of which could be for a broader reason.

9          MR. POLLACK:  I agree, Your Honor, that there is a

10  condition that he is to submit to testing as directed by the

11  Probation Office.  I would assume that that is subject to some

12  good faith and reasonableness.  And to the extent that it's

13  not going to be arbitrarily and capriciously invoked, but I

14  believe that that's understood.

15         THE COURT:  All right.  So the other adjustment

16  we'll make is that in the sex offender assessment and

17  treatment we will say:  You shall participate in a program of

18  sex offender assessment and treatment, including polygraph

19  testing, as directed by the U.S. Probation Office.  And then

20  waive confidentiality as we talked about.

21         There will be a separate paragraph that says that

22  the defendant shall submit to polygraph testing as directed by

23  the U.S. Probation officer.  We're also including —— we took

24  out the payment.  We're also including what I read in, which

25  is the travel restriction.  Okay.  So let me then finish the

1    rest of it.

2           Pursuant to Rule 32.2(a) of the Federal Rules of

3    Criminal Procedure, you, Paul David Hite, are ordered to

4    forfeit an HP laptop computer, they give the model number.

5    The Probation Office shall release the presentence

6    investigation report to all appropriate agencies in order to

7    execute the sentence of the Court.  Treatment agencies shall

8    return the Presentence Report to the Probation Office on the

9    defendant's completion or termination from treatment.

10          In terms of a notice of appeal, pursuant to 18

11   U.S.C. Section 3742, you have a right to appeal the sentence

12   imposed by the Court.  If the period of imprisonment is longer

13   than the statutory maximum, which it's not, or the sentence

14   departs upward from the applicable sentencing guideline range,

15   which it's not.  I would say that you, of course, preserved

16   constitutional rights in terms of being able to appeal if

17   there are violations of those.  If you choose to appeal you

18   have to file an appeal within 14 days after the Court enters

19   judgment.

20          As defined in 28 U.S.C. 2255, you also have the

21   right to challenge the conviction entered or a sentence

22   imposed if new and currently unavailable information becomes

23   available to you or on a claim that you received ineffective

24   assistance of counsel in entering a plea of guilty to the

25   offenses of conviction or in connection with sentencing.

 1  Again, if you're unable to afford the cost of an appeal on any

 2  of these, you can request permission from the Court to file an

 3  appeal without cost to you.

 4          And I believe that covers everything.  So we will

 5  have a judgment and commitment order.  I will do a separate

 6  order relating to the restitution.  There is a request with

 7  the restitution that it include the name, I think, of the

 8  series and the number of images.  I think that's important

 9  because they're trying to keep track of basically the number

10  of images, and it's better in terms of calculations of the

11  cases, and frankly, it helps future cases to know what's

12  involved with it, and also associates the restitution to the

13  particular images that are at issue.

14          So I will go ahead -- that's a request the families

15  made, and I don't have a problem with that.

16          Something else?

17          MR. POLLACK:  Yes, Your Honor.  In terms of a

18  recommendation for service of the sentence.  At the moment,

19  Dr. Hite is not in BOP custody because he's still out

20  pending -- or, I'm sorry, he's in custody pending the retrial,

21  and so he's going to again be designated to a BOP facility.  I

22  would like a recommendation that he be designated to a

23  facility as close to the Richmond, Virginia area as possible,

24  with a recommendation to a facility at Petersburg.  To the

25  extent there is availability in Petersburg at a security level

1    that is appropriate for him.

2         THE COURT:  Okay.  I don't have a problem.  They

3    usually do it close to wherever you designate his home, but

4    I'll put the rest of it in.

5         All right.  Is there anything else from either

6    party?

7         MR. KENT:  One other -- the Government would

8    request that some, I guess, timetable or deadline be

9    established with respect to the payment of restitution.  And

10   this is more towards the two victims in the 8 Kids series

11   because I'm not -- and Mr. Pollack might know -- whatever

12   terms have been reached certainly with his discussions with

13   the representatives of the victims in the three series in

14   which an agreement has been reached.  But if this Court might

15   set some sort of timetable or deadline for the payment of the

16   restitution as ordered by the Court.

17        THE COURT:  Okay.  Mr. Pollack, on the one that you

18   haven't agreed to.  Although it seemed to me that I gave

19   you the -- I actually imposed the restitution that you agreed

20   to, although there isn't a consent.

21        MR. POLLACK:  Your Honor, I don't recall a case

22   where the Court has imposed a deadline on the payment of

23   restitution.  That's a new one on me.  So I don't really have

24   a response.  I mean, I would have to look at the statute in

25   terms of when it says payment is due, to the extent the

1   statute addresses it.  I'm just not -- it's not an issue I was

2   prepared to address.

3           THE COURT:  Generally it's, as far as I know,

4   they're due immediately unless -- due immediately unless the

5   Court has set out some schedule.  These are not very large

6   amounts.  His fines are a different issue.  Have you looked at

7   it?  You're the one requesting it.

8           MR. KENT:  Well, the Government would request that

9   it be due immediately.

10          THE COURT:  I know, but have you looked at the

11  statute to see what it says?

12          MR. KENT:  I don't think -- not in some time, but I

13  don't think the statute is specific as far as timing.

14  Certainly with this Court imposing the fine and the special

15  assessment, the Court has indicated those are due immediately.

16  We would request the same of restitution.  And certainly, I

17  mean -- with respect to the restitution, the Government would

18  request, considering that these are five actual victims, as

19  opposed to payments being made to the Government, as is the

20  case with the fines.  The Government would request that

21  interest be imposed on any amounts not paid immediately.

22          THE COURT:  Well, I understand your request, but

23  have you actually looked at the law to see -- to tell me that

24  this has been done?  My past restitution things have either

25  been paid immediately and/or we have set out a schedule for

1   monthly payments or something if they're not.  My assumption

2   is that Dr. Hite could probably pay these totally.  I forgot

3   what they come to, but they're certainly miniscule compared to

4   the fines.

5            MS. GELBER:  That's correct, Your Honor.  And 18

6   U.S.C. 3664 gives the Court the authority to announce what the

7   payment schedule should be.  In the Court's very detailed

8   findings of facts, you noted that the defendant has

9   approximately $6 million in financial resources and assets.

10  In this case the total amount of restitution is approximately

11  $20,000 or $30,000.  So he has the financial ability to pay

12  immediately, and the Court has the statutory authority --

13           THE COURT:  The financial ability does not get into

14  the restitution in this area.

15           MS. GELBER:  Well, I'm saying --

16           THE COURT:  He does have the wherewithal to pay

17  them as a practical matter.

18           MS. GELBER:  Right.  I mention that because the

19  statute, 3664, addresses in part situations -- directs the

20  Court on how to handle situations where the defendant is

21  subject to a restitution order, but may not have the ability

22  to pay immediately, which is not the situation that we have

23  here.  He does have the ability to pay immediately and the

24  statute provides the Court the authority to direct him to do

25  so.

 1          THE COURT:  I mean, as a practical matter, is this

 2   a nonissue?  You've agreed to all of them except the two and

 3   the two, frankly, are what you agreed to pay anyway.  It's not

 4   what the victims asked for, but it is what I decided that was

 5   the appropriate amount.

 6          MR. POLLACK:  Your Honor, 3664(b) says the Court

 7   may direct the defendant -- I'm sorry.  18 U.S.C.

 8   3664(f)(3)(A) says:  The restitution may direct the defendant

 9   to make a single lump sum payment or partial payments at

10   specified intervals.  It doesn't specify if it's a lump sum

11   payment when that payment would be due.  I have no objection

12   to the Court ordering the restitution to be payable within 30

13   days.

14          THE COURT:  Okay.  Then that's what I'll do.

15          Anything else, Government?

16          MR. KENT:  No, Your Honor.

17          THE COURT:  All right.  Mr. Pollack, anything from

18   you?

19          MR. POLLACK:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  Parties are excused.  Take

21   care.

22   END OF PROCEEDINGS AT 3:05 P.M.

23                        - o -

24

25

1                    C E R T I F I C A T E

2              I, Lisa M. Foradori, RPR, FCRR, certify that

3    the foregoing is a correct transcript from the record of

4    proceedings in the above-titled matter.

5

6

7

8    Date:_____          _____

9                                   Lisa M. Foradori, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25